IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JORGE MELENDEZ,

    Plaintiff,                      No. CIV S-05-0908 DAD

    vs.

MICHAEL J. ASTRUE,           ORDER
Commissioner of Social Security,[1]

    Defendant.
_____/

        This social security action was submitted to the court, without oral argument, for ruling on plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. For the reasons explained below, the undersigned will recommend that the decision of the Commissioner of Social Security (Commissioner) be affirmed.

**PROCEDURAL BACKGROUND**

        Plaintiff Jorge Melendez applied for Social Security Disability Insurance and Supplemental Security Income disability benefits under Titles II and XVI of the Social Security Act (the Act) on January 27, 2003. (Transcript (Tr.) at 67-69, 338-40.) The Commissioner

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Mr. Astrue is substituted as defendant in this suit pursuant to 42 U.S.C. § 405(g) and Fed. R. Civ. P. 25(d)(1).

1

denied plaintiff's application initially and on reconsideration.  (Tr. at 42-46, 49-53.)  Pursuant to plaintiff's request, a hearing was held before an administrative law judge (ALJ) on May 14, 2004, at which time plaintiff was represented by counsel.  (Tr. at 354-97.)  In a decision issued on July 20, 2004, the ALJ determined that plaintiff was not disabled.  (Tr. at 10-25.)  The ALJ entered the following findings:

> 1. The claimant met the disability insured status requirements of the Act on May 5, 2000, the date the claimant stated he became unable to work, and continued to meet them through December 31, 2005.
>
> 2. The claimant has not engaged in substantial gainful activity since May 5, 2000.
>
> 3. The claimant has severe finding [sic] that the claimant has severe osteoarthritis of the knees, status post right knee surgery, ACL repair in August 2000, a history of mild musculoligamentous sprain/strain of the lumbosacral spine; obesity; and a history of hypertension, controlled with medication.  However, he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.
>
> 4. The claimant's allegation that he is unable to perform all regular, sustained work activity is not supported by the objective evidence of record and is not credible.
>
> 5. The claimant has the retained residual functional capacity to capacity to [sic] perform a he [sic] retains the residual functional capacity to perform a full range of light work, except that he cannot do any repetitive squatting or kneeling.  He requires a sit/stand option every hour or so for five to ten minutes.  He has no mental impairments.  (20 CFR 404.1545, 416.945).
>
> 6. The claimant is unable to perform his past relevant work as a bricklayer, a tile setter, and a tile finisher.  (20 CFR 404.1520(e), 416.920(e)).
>
> 7. The claimant is 39 years of age, which is defined as a younger individual.

2

|   |     |   |
|---|-----|---|
| | 8. | The claimant has ninth grade education. He is literate in the Spanish and English languages. (20 CFR 404.1563, 404.1564, 416.963, 416.964). |
| | 9. | In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material. |
| | 10. | If the claimant's exertional capacity were for a full range of light work activities, and there were no nonexertional impairments, in consideration of such a capacity and his age, education and work experience, Guideline Rule 202.17-202.18 of the Medical-Vocational Guidelines of 20 CFR Part 404, Subpart P, Appendix 2, would direct a conclusion that the claimant is not disabled. |
| | 11. | Considering the claimant's age, educational background and residual functional capacity, he is able to make a successful vocational adjustment to work which exists in significant numbers in the national economy. Such work includes: (1) assembler, small product II, 100,000 in the United States; 15,000 in California; and 600 in the local economy; (2) outside deliverer (courier), 70,000 in the United States, 15,000 in the State of California, and 600 locally; and (3) parking lot attendant, 12,000 in the United States, 1500 in California, and 175 in the local economy. |
| | 12. | The claimant was not under a disability, as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f), 416.920(f). |

(Tr. at 23-24.)

The Appeals Council declined review of the ALJ's decision on March 4, 2005. (Tr. at 6-8.) Plaintiff then sought judicial review pursuant to 42 U.S.C. § 405(g) by filing the complaint in this action on May 9, 2005.

## LEGAL STANDARD

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record as a whole and the proper legal standards were applied. Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 973

3

(9th Cir. 2000); Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999). The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. See Miller v. Heckler, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Morgan, 169 F.3d at 599; Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).

A reviewing court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion. See Jones, 760 F.2d at 995. The court may not affirm the ALJ's decision simply by isolating a specific quantum of supporting evidence. Id.; see also Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a finding of either disability or nondisability, the finding of the ALJ is conclusive, see Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

In determining whether or not a claimant is disabled, the ALJ should apply the five-step sequential evaluation process established under Title 20 of the Code of Federal Regulations, Sections 404.1520 and 416.920. See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). This five-step process can be summarized as follows:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).  The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Yuckert, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.; Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

## APPLICATION

Plaintiff advances several arguments in his motion for summary judgment.  First, plaintiff asserts that the ALJ failed to evaluate the impact of plaintiff's morbid obesity pursuant to Social Security Ruling (SSR) 02-01p as required by the Commissioner.  Second, plaintiff argues that the ALJ erred at step two of the sequential evaluation by failing to include plaintiff's sleep apnea as a severe impairment.  Third, plaintiff contends that the ALJ erred by failing to credit plaintiff's testimony regarding the severity of his symptoms and the resulting limitations those symptoms placed upon him without a legitimate basis for doing so.  Fourth, plaintiff maintains that the ALJ failed to include all of plaintiff's limitations in the hypothetical posed to the vocational expert, as required by law.  The court addresses each of plaintiff's arguments below.

**I. Evaluation of the Impact of Plaintiff's Obesity**

Plaintiff argues that the ALJ's failure to evaluate the impact of plaintiff's obesity is demonstrated by the fact that the ALJ's entire discussion of this impairment in his decision consisted of a single sentence that failed to reflect plaintiff's height, weight, or testimony regarding the effects of his obesity on his ability to function.  Plaintiff is 5'8" and in July of 2000 weighed 270 pounds.  As of the date of the hearing on May 14, 2004, he weighed 340 pounds and his Body Mass Index (BMI) was 51.7.  Citing SSR 02-01p, plaintiff explains that the clinical

1  guidelines recognize three levels of obesity and that Level III, which includes persons with a BMI
2  equal to or greater than 40, is termed "extreme" obesity and represents the greatest risk for
3  developing obesity-related impairments.  Plaintiff asserts that SSR 02-01p directs adjudicators to
4  consider the effects of obesity not only under the listings but also when assessing a claim at other
5  steps of the sequential evaluation process, such as the assessment of an individual's residual
6  functional capacity.  Plaintiff notes that SSR 02-01p explains how obesity may increase the
7  severity of related impairments, particularly musculoskeletal and respiratory impairments, and
8  explains how the effects of obesity should be evaluated.  Plaintiff highlights the Ruling's
9  observation that someone with obesity and arthritis affecting a weight-bearing joint may have
10 more pain and limitation than might be expected from the arthritis alone.  Plaintiff contends that,
11 in light of his diagnoses, it was imperative that the ALJ evaluate the additional impact of his
12 severe obesity both singly and in combination with his other impairments.
13           Defendant contends that the ALJ properly evaluated the effects of all of plaintiff's
14 impairments, including obesity, on his ability to perform work activity and that plaintiff has
15 failed to explain any way in which his obesity caused limitations any greater than those found by
16 the ALJ.  Defendant asserts that the ALJ considered the fact that plaintiff's obesity is a severe
17 impairment and concluded that plaintiff's impairments, including obesity, limited plaintiff to a
18 reduced range of light work that included various postural limitations, a sit/stand option, and the
19 ability to elevate his legs during the work day.  Defendant observes that plaintiff has suggested
20 that his impairments met or equaled the listed impairments but has not set forth any evidence
21 supporting the diagnosis and findings of any listed impairment.  Defendant points out that the
22 ALJ specifically analyzed whether plaintiff met or equaled a listing involving weight-bearing
23 joints and the ability to ambulate and also evaluated how plaintiff's obesity impacted the finding
24 of residual functional capacity.
25           The court finds that plaintiff's argument concerning the ALJ's alleged failure to
26 assess the impact of plaintiff's obesity is highly conclusory.  Plaintiff emphasizes the facts

concerning plaintiff's obesity and the requirements of SSR 02-01 but points to no evidence in the record establishing that plaintiff's obesity caused any limitations which were not considered by the ALJ or that plaintiff's obesity caused any limitations greater than those that were considered by the ALJ.

The ALJ listed obesity as one of plaintiff's impairments that can cause significant limitations:

> An impairment is severe within the meaning of the regulations if it imposes significant restrictions in the ability to perform basic work activities. The evidence supports a finding that the claimant has severe osteoarthritis of the knees, status post right knee surgery, ACL repair in August 2000; a history of mild musculoligamentous sprain/strain of the lumbosacral spine; <u>obesity</u>; and a history of hypertension, controlled with medication; impairments which can cause significant vocationally relevant limitations.

(Tr. at 14 (emphasis added).) After reviewing the medical evidence, the ALJ took plaintiff's obesity into consideration when determining whether plaintiff had the residual functional capacity to perform any other work and, if so, the extent of his residual functional capacity:

> The undersigned has considered the claimant's allegations of exertional and nonexertional impairments and how they may interrelate, and finds that the record as a whole does not support the claimant's allegations of extreme pain and functional limitations, or that he would be precluded from performing all work activity. The finding that the claimant can perform a significant range of light work on a sustained basis is supported by the objective clinical findings, the claimant's activities and treatment regimen, and by the opinion provided by the non-examining physician at the Disability Determination Service (DDS). <u>The claimant's obesity has been considered along with his other impairments, in establishing his residual functional capacity</u>, as required by . . . Social Security Ruling 02-1p and Section 1.00F, Appendix 1, Subpart P, Regulations 4. Based on the foregoing, the undersigned finds that the claimant has failed to meet his burden of proof . . . .

(Tr. at 21 (emphasis added).)

/////

/////

Moreover, plaintiff's contention that the ALJ ignored the significance of plaintiff's obesity is contradicted by the record.  Plaintiff's obesity was the first issue raised by plaintiff's counsel, and the ALJ participated in eliciting plaintiff's testimony:

| | | |
|---|---|---|
| ATTY: | . . . . First of all, how tall are you? | |
| CLMT: | 5'8". | |
| ATTY: | And how much do you weigh? | |
| CLMT: | No, like 340 pounds. | |
| ATTY: | Okay. | |

BY ADMINISTRATIVE LAW JUDGE:

| | | |
|---|---|---|
| Q | How much? | |
| A | 340. | |
| Q | You're up to 340? | |
| A | Um-hum. | |
| Q | Wow, that's a lot, how much did you weigh when you injured yourself? | |
| A | Like 200, 220. | |
| Q | 200 to 220? | |
| A | Right. | |
| ALJ: | Okay. | |

(Tr. at 361-62.)  Plaintiff's weight was discussed in the context of his sleep apnea (tr. at 368-69), his ability to perform certain work (tr. at 378), and classes he was taking (tr. at 382).

Accordingly, the court rejects plaintiff's argument that the ALJ failed to evaluate the impact of plaintiff's obesity as required by SSR 02-01p.

## II. Evaluation of Plaintiff's Sleep Apnea

Plaintiff next argues that the ALJ erred at step two of the sequential evaluation by failing to find plaintiff's sleep apnea to be a severe impairment.  Plaintiff contends that the

omission seriously circumscribed plaintiff's claim by excluding the effects of this impairment from having any role in the determination of plaintiff's disability. Plaintiff disputes the ALJ's observation that plaintiff testified that his breathing difficulties and sleep problems are controlled with the use of the breathing mask prescribed by his treating physician and asserts that he actually testified that his sleep had been very bad before he started wearing the mask but that the mask makes him feel a little bit better. Plaintiff concludes that, as a result of the omission of sleep apnea as a severe impairment, the ALJ precluded serious consideration of the symptoms arising from that condition, despite the fact that shortness of breath would affect plaintiff's ability to work on a sustained and consistent basis.

Defendant contends that the ALJ properly evaluated plaintiff's sleep apnea and related breathing complaints. Defendant cites the ALJ's conclusion that, although plaintiff complained to his doctor of shortness of breath and sleep difficulties, his condition was greatly improved and controlled with the use of a C-PAP machine. Defendant also cites plaintiff's testimony that C-PAP therapy helped him sleep, that he slept eight or nine hours per night and felt rested in the morning, and that before using the machine he would fall asleep during the day but after using it his breathing improved and he never napped or slept during the day. Defendant asserts that plaintiff's own testimony contradicts plaintiff's contention that his breathing complaints would affect his ability to work. Defendant notes that plaintiff has not cited any medical opinion that plaintiff's breathing complaints limit his ability to work and has not articulated any way in which plaintiff's breathing condition is functionally limiting or causes limitations greater than those found by the ALJ.

It is well established that at step two the ALJ must determine if the claimant has a medically severe impairment or combination of impairments. Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996) (citing Yuckert, 482 U.S. at 140-41). The purpose of step two of the sequential evaluation is merely to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into

1  account. Yuckert, 482 U.S. at 153. "An impairment or combination of impairments can be
2  found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a
3  minimal effect on an individual's ability to work.'" Smolen, 80 F.3d at 1290 (citations omitted).
4  See also 20 C.F.R. §§ 404.1521(a), 416.921(a).

5  Here, plaintiff's sleep apnea is a medical issue that arose after plaintiff applied for
6  benefits in January 2003. A medical record dated October 17, 2003, reflects that plaintiff
7  complained on that date of shortness of breath and indicated that he stops breathing while
8  sleeping at night. (Tr. at 336.) At the hearing on May 14, 2004, plaintiff's attorney elicited
9  plaintiff's testimony that he had a sleep problem, told his doctor he couldn't sleep at night, was
10 given a mask to wear, and the mask makes him feel better. (Tr. at 368.) The ALJ asked counsel
11 what plaintiff was talking about, and she explained that plaintiff was recently diagnosed with
12 sleep apnea and now sleeps with a breathing mask machine. (Id.) Testimony continued as
13 follows:

> ATTY:  How many hours of sleep are you getting a night?
> CLMT:  Eight to nine hours at night.
> ATTY:  You feel rested when you get up in the morning?
> CLMT:  Yes.
> ALJ:   How is that mask working, is that helping?
> CLMT:  Yes . . . .

(Tr. at 368-69.)

At the conclusion of plaintiff's testimony concerning his breathing problems and sleep apnea, the ALJ asked counsel whether plaintiff was "alleging medical impairments that are not reflected here and are precluding him from working that are not reflected in the orthopedic evaluations." (Tr. at 369.) Counsel responded:

> Well, his depression would be one, and <u>the sleep apnea would be a recent diagnosis. But he seems to be okay with the treatment that he's receiving</u>. And also, recently experiencing some heel pain

1 | that you would see, I believe, in the Sacramento Family Medical
2 | Clinic records.

(Tr. at 370 (emphasis added).) The ALJ turned to the issue of residual functional capacity:

ALJ: So, we're focusing whether he's got a sedentary functioning ability or light functioning ability. The sleep apnea, sounds like he's got that under control.

ATTY: Sure.

ALJ: And that really never has been alleged.

(Id.) Plaintiff's counsel later elicited from plaintiff his testimony that he does not sleep during the day at all now but, before he got the mask, used to fall asleep anywhere. (Tr. at 387-88.)

The record does not include any medical opinion that plaintiff's breathing complaints or his sleep apnea limit his ability to work. Plaintiff testified that, using the mask, his sleep improved, his breathing improved, and he no longer naps or falls asleep during the day. (Tr. at 387-88.) At the hearing plaintiff's counsel identified sleep apnea as a medical impairment not reflected in the orthopedic evaluations that might preclude plaintiff from working but then immediately described the impairment as resolved by treatment. The ALJ was not presented with any evidence that plaintiff's sleep apnea or the related breathing problems limit plaintiff's ability to work. Thus, the court cannot find that the ALJ erred at step two of the sequential evaluation in not finding plaintiff's sleep apnea to be among his severe impairments.

### III. Credibility of Plaintiff's Testimony

Plaintiff asserts that the ALJ failed to credit plaintiff's testimony without a legitimate basis for doing so. Plaintiff argues that once a claimant produces objective medical evidence of an impairment, the adjudicator may not reject the claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of subjective symptoms such as pain. Plaintiff asserts that nothing in the record supports the ALJ's conclusion that plaintiff's testimony was not credible or that his daily activities evidenced an ability to engage in substantial gainful employment. Plaintiff argues that he suffers from severe

osteoarthritis of the knees, musculoligamentous sprain/strain of the lumbosacral spine, obesity, obstructive sleep apnea, depression/anxiety, and hypertension, which singly and in combination cause severe pain and functional limitations.  Plaintiff cites the complete absence of evidence of malingering by plaintiff and the ALJ's own observation that plaintiff had a solid work history through 2000.  Plaintiff challenges the ALJ's finding that plaintiff's activities were "incompatible with the presence of a disabling level of pain" because the characterization of those activities was inaccurate and failed to capture the extent of plaintiff's limitations.

Defendant disputes plaintiff's contention that the ALJ's analysis of daily activities negatively impacted his credibility finding, on the ground that the ALJ considered multiple factors, including daily activities, in assessing credibility and plaintiff has failed to challenge any of the other factors that supported the ALJ's credibility analysis.  Defendant cites the ALJ's reliance on clinical examination findings to discount plaintiff's pain testimony and in particular the absence of clinical findings showing that plaintiff had disabling functional limitations corresponding to his knee injuries.  Defendant points to the following findings as failing to corroborate plaintiff's testimony:  plaintiff had a normal neurovascular examination and full range of motion in his right knee, with some tenderness but no swelling or instability; Dr. Smith said plaintiff was doing fine and had only some occasional achiness in his right knee; and Dr. Yashruti documented an unremarkable examination of plaintiff's knees and noted that plaintiff moved around the examination room and got on and off the examination table without difficulty, had normal ranges of motion, stability, and reflexes, negative straight leg raising, and no weakness in his lower extremities.  Defendant notes that there was evidence that plaintiff had some difficulty kneeling and squatting, and the ALJ accommodated those complaints by limiting plaintiff to no repetitive squatting or kneeling, consistent with Dr. Yashruti's opinion that plaintiff should be precluded from such activity.  Citing Dr. Yashruti's opinion that plaintiff had no residual of any back injury and Dr. Seymour's opinion that there was no disability associated with plaintiff's back condition, defendant asserts that there was no objective evidence that

plaintiff was more limited by back pain than found by the ALJ.  Citing the evidence that plaintiff had good range of motion, was pain free, and stated he was happy with the results of the removal of a bone spur from his foot, defendant argues that there was no evidence that plaintiff was more limited by foot pain than found by the ALJ.

Defendant notes that no aggressive forms of treatment were recommended by any of plaintiff's doctors, with Dr. Smith advising plaintiff to use only ice and over-the-counter medication to relieve symptoms, and that plaintiff had not sought or undergone consistent treatment for his allegedly disabling pain.  Defendant argues that the ALJ properly relied on evidence of symptom magnification because two doctors documented positive Waddell's signs and stated that plaintiff overreacted to light palpations.

Defendant asserts that the ALJ included plaintiff's need to elevate his legs in the hypothetical question posed to the vocational expert, and the ALJ's decision accommodated plaintiff's testimony concerning his need to stand up periodically during the day and his estimate that he could sit for an hour to one and a half hours at a time before needing to stand up and move around for about ten minutes.

With regard to the ALJ's consideration of plaintiff's daily activities, defendant agrees that the ALJ found that some of those activities, such as driving, shopping, attending church, teaching children's classes, going on family outings, and attending classes, contradicted plaintiff's allegations of disabling limitations.  Defendant admits that the evidence of plaintiff's daily activities could be interpreted more favorably to plaintiff but argues that the ALJ's interpretation was also rational and must be upheld.

It is well established that the determination of credibility is a function of the ALJ, acting on behalf of the Commissioner.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An ALJ's assessment of credibility should, in general, be given great weight.  Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985).  Thus, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner.  Morgan v. Comm'r of Soc. Sec.

Admin., 169 F.3d 595, 599 (9th Cir. 1999).  In evaluating a claimant's subjective testimony regarding pain and the severity of his or her symptoms, an ALJ may consider the presence or absence of supporting objective medical evidence along with other factors.  See Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (en banc); see also Smolen, 80 F.3d at 1285.  Ordinary techniques of credibility evaluation may be employed, and the adjudicator may take into account prior inconsistent statements or a lack of candor by the witness.  See Fair v. Bowen, 885 F.2d 597, 604 n.5 (9th Cir. 1989).

Nonetheless, an ALJ's rejection of a claimant's testimony must be supported by specific findings.  Morgan, 169 F.3d at 599; Matthews v. Shalala, 10 F.3d 678, 679 (9th Cir. 1993) (citing Miller v. Heckler, 770 F.2d 845, 848 (9th Cir. 1985)).  Once a claimant has presented medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms merely because the symptoms are unsupported by objective medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).  Rather, "'the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so.'"  Light, 119 F.3d at 792 (quoting Smolen, 80 F.3d at 1281).  See also Reddick, 157 F.3d at 722.

Here, plaintiff's medical records document conditions which might reasonably be expected to cause the symptoms alleged by plaintiff.  However, while plaintiff alleges that he is totally unable to work due to pain and the severity of his symptoms, the ALJ made specific and detailed findings in not fully crediting plaintiff's testimony in this regard.  The court recognizes that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."  See Reddick, 157 F.3d at 722.  However, despite being questioned by his own attorney regarding his daily activities, plaintiff testified to minimal limitations with respect to many activities.  While the record does not indicate that plaintiff goes about all of his activities with ease, the court finds that the ALJ fairly characterized the record and sufficiently stated

specific, clear and convincing reasons for not fully crediting plaintiff's testimony regarding the severity of his symptoms. See Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998). Therefore, plaintiff's argument to the contrary must be rejected.

**IV. Inclusion of Limitations in Hypothetical**

Plaintiff's final argument is that the ALJ failed to include all of plaintiff's limitations in the hypothetical he posed to the vocational expert. Specifically, plaintiff argues that the hypothetical did not reflect either the frequency or length of time plaintiff would need for breaks and for elevating his legs. Plaintiff contends that he needs to elevate his legs for 20-25 minutes six or seven times a day in order to relieve his pain, but the ALJ's hypothetical reflected a need for only three or four breaks lasting 5-10 minutes. Plaintiff points out that the vocational expert testified that three breaks could be accommodated during regularly scheduled break times but it would be atypical to find a job that would allow a person to elevate his legs more than three times a day. Plaintiff also focuses on the vocational expert's testimony that the meal break would probably be the only time a person could elevate his legs for as long as 25 minutes during the work day and that unscheduled breaks would not be practical.

Defendant responds that the ALJ's hypothetical question accurately described plaintiff's established functional limitations and the additional limitations suggested by plaintiff were properly rejected by the ALJ as not supported by the evidence. Defendant argues that the ALJ's reliance on the vocational expert's testimony given in response to the hypothetical was therefore proper.

At step five of the sequential evaluation, the ALJ is required to question a vocational expert in a manner that properly takes into account the limitations on plaintiff's abilities to engage in various work-related functions. See Holohan v. Massanari, 246 F.3d 1195, 1208-09 (9th Cir. 2001). "While the ALJ need not include all claimed impairments in his hypotheticals, he must make specific findings explaining his rationale for disbelieving any of the

/////

claimant's subjective complaints not included in the hypothetical." Light v. Soc. Sec. Admin., 119 F.3d 789, 793 (9th Cir. 1997).

The record reflects that the ALJ asked the vocational expert a series of hypotheticals, and plaintiff's counsel extended them further.

> Q    Assume first that he has a full range of light functioning ability as that term is defined in the DOT, except he cannot do any repetitive squatting or kneeling. Otherwise, he has pretty much the full range of light taking into account, though his difficulties, and we're going to move into the sit/stand scenarios. But, taking into account without really considering those in this first hypothetical, we have a man in his late 30's with a ninth grade education in Mexico City and some ESL classes here. And he is literate in English and Spanish and a work history as you've described. Are there jobs that such a person could be able to do at this light level, and if so, give me examples of those jobs.
>
> A    Okay. With a sit/stand option, is that what you –
>
> Q    Well, I think we're going to need that anyway, so we might as well just move into that and say yes, with a sit/stand option every hour or so for five to ten minutes.
>
> A    Well, there are assembler jobs that such a person could perform, as well as if I think it's not more than an hour, there are some driving occupations, too. Assembly small products II . . . .
>
> . . . .
>
> Delivery outside, . . . that's more like just a courier, and I think with those limitations a parking lot attendant would work . . . .
>
> Q    Okay. Now, let's assume basically the same hypothetical, light, he can lift 10 frequently and 20 occasionally, he needs a sit/stand option as described in the previous one. And on occasion, he needs to elevate his legs during the day, not regularly, but on occasion he needs to be able to have an opportunity to elevate his legs. I realize, and it's really difficult, his problems vary from day-to-day, and there's no medical estimates as to the leg elevation he needs in the medical file. But, let's assume that he needs to elevate his legs for about 10 minutes three or four times a day.
>
> A    Okay, if it was three or four times a day, then he should be able to elevate it during the breaks. Four times a day then that's going to make it a little more difficult.
>
> Q    Three times a day, he ought to be able to do that every two hours.

16

1      A      Right.

2      Q      He could do all these jobs that you've cited?

3      A      Yes.

4      Q      There would be an opportunity to do that?

5      A      Right, you should be able to do that during your breaks.

6      Q      Um-hum.

7      A      Is there a problem – they're going to be a few that he might be able to perform, I've got – but, that's yeah – I don't think that there's – it's going to be atypical to find a job that you could elevate your legs more than three times a day with one in which you're going to be able to perform the job as well as elevate.

(Tr. at 393-95.) On examination by plaintiff's counsel, the vocational expert was asked about breaks of 15-20 minutes in those same jobs:

     A      Yes, I think that would work, yes.

     Q      Okay. And how about if he had to take any unscheduled breaks?

     A      Well, these are jobs in which you're going to have to be able to leave. Someone actually would be replacing you or being relieved of your duties for your break, so unscheduled breaks would not work.

     Q      Okay. And then with the elevating of the legs, assuming it's what he testified to earlier is true, he has to elevate his legs every – for about – he mentioned 20 to 25 – or 15 to 25 minutes I believe, would he be able to do that?

     A      Yeah, I wouldn't think that you would have the option except during your meal break to be able to elevate up to 25 minutes.

     Q      Okay.

(Tr. at 396.)

In the opinion of the vocational expert, the same jobs would be available to plaintiff even if he needed to elevate his legs up to three times during the work day for up to 25 minutes during the meal break and for up to 20 minutes during two additional breaks. Plaintiff testified that the pain in his knees is constant, almost all day every day, yet he engages in a great

17

many activities despite the pain largely by elevating his legs "almost for 20 minutes, 25 minutes" six or seven times a day, although Tylenol also provides him with relief for three to four hours. (Tr. at 362-64.)

The court finds that the series of hypotheticals posed by the ALJ, with the additions made by plaintiff's counsel, reflected both the frequency and the length of time plaintiff might need for breaks and for elevating his legs. Plaintiff did not testify that he needs to elevate his legs for 25 minutes every time he needs to relieve pain in his knees. Nor did he testify that he would need to elevate his legs six or seven times during an eight-hour period. The three breaks typical in an eight-hour work day, together with a break immediately after the work-day ended and two additional "breaks" while at home, would add up to six periods of time when plaintiff could elevate his legs, and at least three of those periods would permit elevation for 25 minutes or more. Thus, the vocational expert was questioned in a manner that properly took into account the limitations on plaintiff's abilities to engage in various work-related functions. Plaintiff's argument to the contrary is unpersuasive.

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment is denied;

2. Defendant's cross-motion for summary judgment is granted; and

3. The decision of the Commissioner of Social Security is affirmed.

DATED: March 2, 2007.

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:kw
Ddad1/orders.socsec/melendez0908.order